UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,                  Cr. No. 17-20263

        v.                          Hon. Victoria A. Roberts

Tionna Shirelle Mitchell,

        Defendant.

_____/

## TIONNA MITCHELL'S EMERGENCY
## MOTION FOR COMPASSIONATE RELEASE

Earlier this week, Chief Judge Hood granted Tionna Mitchell compassionate release under 18 U.S.C. § 3582(c) after extensive briefing describing the dangers within Danbury FCI to Mitchell's health. *See* Ex. A – *United States v. Mitchell*, No. 17-20652, R. 56. While being processed for immediate release, BOP determined that even though Mitchell was serving a combined term of incarceration, it would not release her due to this Court's sentence.

Mitchell now moves this Court to likewise find that she meets the standard for compassionate release and grant her immediate release. Mitchell has been in custody since September 2017 and in February 2020 transferred from the Sanilac County Jail to Danbury FCI in Connecticut. No one could have predicted that the county Danbury FCI is in would become one of the hardest hit by the COVID-19

pandemic: 16,840 cases and 1,091 confirmed deaths as of July 27, 2020.[1] Danbury FCI is not immune to such morbid reality, nor is Mitchell protected from it.

## BACKGROUND ON MITCHELL'S SENTENCES

Mitchell became a prisoner of the U.S. Marshal in September 2017, after being arrested for a non-violent retail-fraud scheme. PSR, Case No. 17-20263. The case was assigned to this Court. A month later, in October 2017, Mitchell was additionally charged with crimes related to her attempt to fraudulently obtaining a car loan. PSR, Case No. 17-20652, ¶ 7. That case was assigned to Judge Hood.

In April 2018, Judge Hood sentenced Mitchell to a total prison sentence of 34 months. This included 10 months' concurrent custody on two fraud counts, and a mandatory 24 months' consecutive on an aggravated identity theft charge. Judge Hood had "no objection to this sentence being served concurrently to any sentence that may be imposed on Docket Number 17-20763, which is pending before the Honorable Victoria A. Roberts in the Eastern District of Michigan." *United States v. Mitchell*, No. 17-20652, R. 39, Judgment, PgID 128.

On November 21, 2019, this Court imposed a total sentence of 32 months. This included 20 months on five counts (Counts 1, 2, 3, 7, and 10, running concurrent with each other), and 12 months on two others (Counts 4 and 8, run concurrent to

---

[1]  Connecticut Government, COVID-19 Update, July 28, 2020, *available at* https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary7282020.pdf.

each other, but consecutive to the other five counts). R. 85, Amd. Judgment, PgID 757. The Court ordered that the sentence "shall be served concurrently to the defendant's undischarged term of imprisonment in the Bureau of Prisons being served under Docket Number 17-CR-20652-01." *Id.*

If these sentences are fully concurrent, then Mitchell would serve 29 months (34 months, with 5 months of good time credit). If she served 29 months, then she would have been released in February 2020, five months ago. Instead, BOP has calculated Mitchell's release date as May 2021. Undersigned counsel spoke to Mitchell's former attorney, Karen Roberts, who expressed that she disagreed with this calculation and was so concerned about it that she wrote to this Court. In March 2020, BOP sent this explanation of how it "aggregated" the two sentences:

> Each Federal sentences commenced on the respective date of imposition, with the 32 month sentence overlapping the pre-existing 34 month term. When the concurrent overlap is added to the 34 months sentence, as required by Title 18 U.S.C. § 3584(c), the result is a 4 year, 3 months and days aggregate term of confinement.
>
> 4-12-18 to 11-21-2019 Concurrent overlap = 1 year 7 months 11 days
>
> + Anchor sentence of 34 months (imposed 4-12-18)
> _____
>
> = Aggregated Sentence TIE of 4 years 5 months 12 days
>
> The gap between the two sentencing dates is considered a "Concurrent Overlap."
>
> Both sentences were the aggregated. The aggregate has to account for the time between the first and second sentence. By utilizing the newly derived TERM (The Anchor sentence 34 months + concurrent overlap 1 Y 7 month 11 days), the second Sentence(your imposed sentenced) received the benefit of the applicable jail credit & the Good Conduct time based upon Sentence #1.

Ex. B – Ltr. from Hon. Victoria A. Roberts.

This explanation is not entirely clear to counsel. It mentions an aggregated sentence of 4 years and 3 months but also a sentence of 4 years and 5 months and 12 days, and it is unclear why BOP added the overlap to the sentence of 34 months. In any event, this Court reviewed the explanation and confirmed that it was satisfied that Mitchell's release date is May 12, 2021.

Mitchell remained at the Sanilac County Jail until February 2020. Then, just before the COVID-19 pandemic came crashing down on the federal prison system, Mitchell was transferred to Danbury FCI. On April 27, 2020, Mitchell filed a pro se letter in this district with Judge Hood requesting compassionate release, and after extensive briefing, Judge Hood granted the motion on July 27, 2020.

## COMPASSIONATE RELEASE LEGAL STANDARD

The First Step Act amended 18 U.S.C. § 3582(c)(1)(A)(i) to permit judges to consider and grant a sentence reduction when "extraordinary and compelling reasons warrant such a reduction." Such a reduction should be consistent with the sentencing factors in 18 U.S.C. § 3553(a) and the Sentencing Commission's applicable policy statements.

The policy statements in U.S.S.G. § 1B1.13, cmt. 1(A) were revised before the First Step Act, so arguably "[t]here is no policy statement applicable to motions for compassionate release filed by defendants under the [Act]." *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. June 28, 2019). The Act broadened

courts' discretion to use § 1B1.13 cmt. n.1(D) in determining what "extraordinary and compelling circumstances" are and if reasons other than age, medical conditions, or family circumstances exist. *See, e.g., United States v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020); *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020).

While the Court need not defer to the policy statements, if it does so, Mitchell satisfies them. The majority of judges in this district have recognized that prisoners who are particularly vulnerable to severe complications from COVID-19 present extraordinary and compelling reasons for release under § 3582(c)(1)(A)(i). In particular, Mitchell's obesity "substantially diminishes [her] ability . . . to provide self-care within the environment of a correctional facility[.]" U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii). *See, e.g., United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *2 (E.D. Mich. May 21, 2020) (collecting cases); *United States v. Goins*, No. 11-cr-20376, 2020 WL 3064452, at *6 (E.D. Mich. June 9, 2020). Additionally, Mitchell presents "Other Reasons" warranting release under section 1B1.13 because during this COVID-19 continuing upward trajectory of infection, prisoners with underlying medical conditions cannot undertake the basic CDC guidelines for self-care and protection. *See, e.g., Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084, at *3 (E.D. Mich. Apr. 9, 2020).

5

**ARGUMENT**

**I. Mitchell Exhausted BOP Administrative Remedies.**

Section 3582(c)(1)(A)(i) generally requires exhaustion of administrative remedies. Mitchell requested a reduction in sentence/compassionate release[2] from the warden at Danbury FCI on May 14, 2020, Ex. C – Tionna Mitchell Administrative Request and Denial, and the warden denied the request on June 1, 2020, *Id*. Thus, Mitchell's request is now ripe for review and granting before this Court. *See* § 3582(c)(1)(A)(i).

In its communication with counsel, the government concedes that Mitchell exhausted her administrative remedies.

**II. Factors Support a Finding of Extraordinary and Compelling Reasons Warranting Mitchell's Release.**

**A. The CDC recognizes that Mitchell's obesity puts her at increased risk of severe illness from COVID-19.**

Mitchell suffers obesity, a CDC-identified high risk factor for poor prognosis in people with COVID-19.[3] She has a body mass index (BMI) of 31 to 32. A BMI

---

[2] BOP Program Statement 5050.50 – 1/17/2019 uses the terms "compassionate release" and "reduction in sentence" interchangeably.

[3] Racial and ethnic differences in COVID-19 outcomes are also of great import in measuring the pandemic's effect in the US. Mitchell, whom identifies as a Black woman, is part of the larger class of communities that are experiencing hard hit health outcomes with this illness. *See* Eboni G. Price-Haywood et al., *Hospitalization and Mortality among Black Patients and White Patients with Covid-19*, 382 N England J. Med. 2534 (June 25, 2020) (study of a large cohort of Louisiana patients found that Black and female patients represented the majority of COVID-

6

that is above 29.9 moves an individual from a category of overweight to obese. In response to a class-action lawsuit against Danbury FCI, *Martinez-Brooks v. Easter*, No. 20-569 (D. Conn.), BOP staff identified her as being in the class of people with high risk factors for serious illness from COVID-19 because of her obesity. Ex D – Email from Sarah F. RussellPe.

Last month, the CDC updated its list of individuals at risk of poor prognosis for severe illness due to COVID-19. CDC, *CDC updates, expands list of people at risk of severe COVID-19 illness* (June 25, 2020), https://perma.cc/UJT9-JMHS. In recognizing developing research, the CDC now includes obesity with a BMI of 30 or above as part of the higher risk group. *Id.*; CDC, COVID-19, *Who Is at Increased Risk for Severe Illness?*, https://perma.cc/TNN7-UJZ2 ("Having obesity, defined as a body mass index (BMI) of 30 or above, increases your risk of severe illness from COVID-19."). This new guidance lowers the obesity cutoff that the CDC previously recognized as a risk factor for COVID-19.

The CDC's list of risk factors is now in line with research detailing that individuals less than 60 years old, with a BMI between 30 and 34, like Mitchell, are twice as likely to need acute medical care related to COVID-19 than those with a

---

19 positive patients; Black patients were disproportionately among all patients who died in the hospital; and factors such obesity were among those that increased the odds of required hospitalization), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMsa2011686.

BMI less than 30. Jennifer Lighter et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, Clinical Infectious Diseases (2020), https://perma.cc/LP4H-V3F4. Further, individuals under 60 years old with BMIs between 30 and 34 were 1.8 times more likely to need care in an Intensive Care Unit than those with BMIs under 30. *Id.*

In fact, obesity is one of the most serious risk factors for younger individuals admitted to the hospital as a result of COVID-19. David A. Kass et al., *Obesity could shift severe COVID-19 disease to younger ages*, The Lancet (May 16, 2020), https://perma.cc/5HFW-89TA. A study at John Hopkins documented a correlation between obesity and worse outcomes for younger individuals who contract COVID-19. *Id.* The authors explain: "Obesity can restrict ventilation by impeding diaphragm excursion, impairs immune responses to viral infection, is pro-inflammatory, and induces diabetes and oxidant stress to adversely affect cardiovascular function." *Id.*

Even after Judge Hood granted Mitchell compassionate release, the prosecuting attorney has refused to concede that Mitchell's CDC-recognized high risk of COVID-19 complications due to obesity meets the "extraordinary and compelling" standard. This conflicts with the position taken by other prosecutors in this district whom agreed that a BMI over 30 satisfies the "extraordinary and compelling" standard. For example, in *United States v. Ireland*, the government agreed that a BMI over 30 means the defendant "satisfies the 'extraordinary and

8

compelling' standard under 1B1.13(1)(A)." No. 17-20203, R. 35-1, AUSA Email, PgID 200 (E.D. Mich. July 17, 2020). And in *United States v. Pacely*, the government acknowledged that a defendant's BMI of 38.5, along with diabetes, qualified as extraordinary and compelling reasons, even in a facility with no confirmed COVID-19 cases. No. 18-20283, R. 28, Resp., PgID 145 (E.D. Mich. July 8, 2020). The bottom line is that the government disparately treats vulnerable individuals in this district even when they meet the CDC's high risk category for serious COVID-19 complications.

Like Judge Hood, other judges in this district also have granted release during this pandemic because of an inmates' showing that they are obese within the BMI of 30 to 40. *See United States v. Ireland*, No. 17-20203, 2020 WL 4050245, at *4 (E.D. Mich. July 20, 2020); *United States v. Roe*, No. 15-20581, R. 374 (E.D. Mich. July 16, 2020).

### B. COVID-19 is ravaging the Bureau of Prisons.

The COVID-19 pandemic is ravaging the BOP with growing public health concerns. BOP's statistics show that more than 10,400 inmates contracted the disease; 1,166 BOP staff contracted the disease; and at least 103 inmates died from it. Yet at the same time, COVID-19 testing of the inmate population is below 30%. The outcry has continued, even from BOP staff, about how poorly this crisis is being handled by BOP. Staff have filed an OSHA complaint alleging BOP has "failed to

introduce workplace controls to mitigate or prevent exposure or further exposure to the virus," including at Mitchell's facility.[4]

### C. Danbury FCI is a particularly hard hit BOP facility by COVID-19.

Danbury FCI was one of the first institutions listed in the Attorney General's April 3, 2020 letter discussing "BOP facilities where COVID-19 is materially affecting operations." *See* Memorandum from Attorney General William Bar to Director of Bureau of Prisons, *The Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (April 3, 2020) available at https://politi.co/2UV3JBi. Danbury's response lagged behind state correctional systems.[5] The president of the local union representing federal correction officers at Danbury, and a correctional officer himself, explained that masks and other protective equipment were not readily available throughout the facility. *Id*. Moreover, the "daily guidance from the [BOP] changes every other day. . . . They wait until it's right on their doorstep before they want to act and intervene on something." *Id*.

---

[4] *See* OSHA Compl., https://www.afge.org/globalassets/documents/general reports/coronavirus/4/osha-7-form-national-complaint.pdf. This complaint was filed in March when there were 28 confirmed inmate cases, 24 confirmed staff cases, and one inmate death. The situation is exponentially worse now.

[5] Kelan Lyons, *Left in the dark: families with loved ones in Danbury prison*, CT Mirror, Apr. 27, 2020, https://ctmirror.org/2020/04/27/left-in-the-dark-families-with-loved-ones-in-danbury-prison/.

The federal court overseeing the class-action entered a temporary restraining order in light of the prison's failures in evaluating inmates for compassionate release. *Martinez-Brooks v. Easter*, No. 20-569, 2020 WL 2405350, at *32 (D. Conn. May 12, 2020). The court found that Danbury inmates "plausibly alleged that the Warden has failed to implement adequate measures to prevent the continued spread of COVID-19 at the prison." *Id.* at *31. They alleged "that instead of screening inmates for COVID-19 in good faith, so that symptomatic patients can be tested and, if necessary, isolated, prison officials have 'falsely discounted the readings of elevated temperatures in order to avoid taking appropriate follow-up action.'" *Id.* In addition, "a woman at the satellite prison exhibiting serious symptoms was ignored by correctional staff and left among the general population for hours, despite the urgings of the other prisoners, before finally being taken to the hospital where she tested positive for COVID-19." *Id.* And "prison officials threatened retaliation against any inmate who told anyone on the outside about this incident." *Id.*

The petitioners provided declarations showing that the "severe outbreak of COVID-19" at Mitchell's particular facility "has been utterly mishandled by BOP" and "shows no signs of abating." Ex. E – Petitioners' Memorandum at 4. All of the women "share the same three bathrooms, each of which includes between 4-8 toilets, sinks, and showers." *Id.* "Water in the unit will sometimes be shut off for a few hours or more than a day at a time, including for about 17 hours in early April." *Id.* at 4-5.

11

"The phones and computers are not cleaned between each use." *Id.* at 5. "Hand sanitizer has been out of stock at the commissary since the beginning of the pandemic," and "[t]he soap dispensers in the bathrooms are empty." *Id.* Also:

> Staff have been taking the women's temperatures, which are sometimes recorded as artificially low, or exactly the same for several women in a row. Sometimes staff tell women with a high temperature to drink cold water before retaking their temperature. One women had a temperature of 102 degrees according to hospital staff. Her temperature, when taken at the facility about an hour earlier registered 97 degrees.

*Id.* at 6 (citations to declarations omitted).

While the COVID-19 outbreak at Danbury has recently abated, inmates that are part of the vulnerable class identified both by the CDC and BOP staff, like Mitchell, fear a resurgence of the spread at their facility.

### III. The Sentencing Factors Favor Mitchell's Release.

None of the § 3553(a) factors bar Mitchell from the relief sought here. Her conduct and convictions are serious, but even when a crime is "egregious," when it is "ultimately nonviolent," there can be safeguards to ensure a person "continues to serve his term to completion and comply with Court guidelines" while on home confinement. *United States v. Al-Jumail*, No. 12-20272, 2020 WL 2395224 at *5 (E.D. Mich. May 12, 2020). She has *no* disciplinary infractions in prison. Ex. F – Tionna Mitchell BOP Data at 1. And, more importantly, she is eligible for home detention starting December 8, 2020, a little over four months from now. *Id* at 3. In a span of four months, much happened in the BOP to the deleterious effect of inmate

12

and staff health due to COVID-19, and the spread continues. Mitchell should not bear that high risk of potential death or long-term COVID-19 complications any further.

In granting compassionate release, Judge Hood took a deliberate approach in considering and analyzing the government and Mitchell's arguments related to the § 3553(a) factors. *United States v. Mitchell*, No. 17-20652, R. 56 at 13-17. Ultimately, Judge Hood found that the § 3553(a) factors did not bar Mitchell from release. In its communication with counsel, after Judge Hood ordered Mitchell's release, the government continues to oppose release on § 3553(a) grounds.

*Mitchell has a solid release plan*: If released by this Court, Mitchell intends to live with her mother, Rosalind Mitchell, whom confirmed to counsel that: (1) her home is located on XXXXX Twelve Mile Road, Apt. XXX, Southfield, Michigan 48024; (2) there is a room for Mitchell to self-quarantine for the recommended fourteen days after her release; (3) Mitchell will only be allowed to use the common space (i.e., restroom) as needed during the quarantine period; and (5) it is a safe environment that is clear of drugs and crime.

*Community members support Mitchell*: Rosalind Mitchell is aware of the supervised-release conditions imposed by this Court on her daughter, and she is ready and able to ensure Mitchell's compliance. Ex. G – Ltr. from Rosalind Mitchell. Mitchell's sister-in-law, Crystal Green, also writes a letter on behalf of her family.

Ex. H – Ltr. from Crystal Green. She explains that Mitchell authored children's books while in custody and continues to make strides in effective and positive use of her period of incarceration. Ms. Green says Mitchell "is driven, goal oriented, and determined to use the lessons of her past to positively impact her future and her community." Ms. Green adds, "I am convinced that she will make us all proud, and that she is worth the investment of our good faith, time and energy."

Others attest to Mitchell's remorse and strong potential for community success. Ex. I – Ltr. from Akilah Paramore; Ex. J – Ltr. from Janae Coachman; Ex. K – Ltr. from Erica Brewer. In particular, Akilah Paramore attests that Mitchell's "entire outlook on life seems to have changed." Ex. I. Further, Paramore pledges her support to help Mitchell re-enter the community, explaining that she has "a network of resources that assist returning citizens with wraparound services such as transportation, counseling, appropriate work attire, food assistance, and other services that help to reduce recidivism." *Id*.

In sum, the information and letters submitted here provide the Court with indicators of Mitchells' residential situation, family support to meet home confinement and supervised conditions imposed on her, and the family's investment in her successful adjustment. This lends strong support to Mitchell's release from Danbury FCI to home confinement.

14

*Mitchell should not quarantine at the BOP*: This Court should not subject Mitchell to a fourteen-day quarantine at Danbury. Placement in "quarantine" does not protect inmates from contracting COVID-19 because they remain exposed to staff who circulate in and out of the quarantine location, as well as the prison and community at large. Courts have properly concluded this "Kafkaesque" 14-day "quarantine" "is neither quarantine nor limited to 14 days." *United States v. Scparta*, 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020). Instead, it involves housing with many others in conditions that permit the virus to spread. *Id.*[6]

## CONCLUSION

Tionna Mitchell requests that this Court grant her compassionate release.

Submitted,

s/Fabián Rentería Franco
s/Benton C. Martin
Counsel for Tionna S. Mitchell
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, MI 48226
P: 313.463.6143
Dated: July 29, 2020               E: Fabian_Renteria_Franco@fd.org

---

[6] One of counsel's clients recently underwent a period of "quarantine" in preparation for his transition back into the community. It confirmed that BOP's quarantine process is a mess. Counsel's client was in a quarantine unit for about nineteen days, with others that were coming and going to the hospital or transferring from other facilities and that were in proximity to people with more frequent contact with the non-prison community. Moreover, after he completed the quarantine period, he was driven to a bus station, sat in a bus station for fifteen hours, and then travelled via public bus to this district for halfway house placement. *See United States v. Jerome Tookes*, No. 17-20416, R. 44 – Supplement (E.D. Mich. July 21, 2020).

15

## CERTIFICATE OF SERVICE

I certify that on July 29, 2020, I filed

- Emergency Motion for Compassionate Release
- List of Exhibits and Exhibits

through the court's electronic docketing system, which should send notification to opposing counsel of record.

s/Fabián Rentería Franco