United States District Court
Eastern District of Michigan
Southern Division

United States of America,

      Plaintiff,                Case No. 17-20263

v.                           Honorable Victoria A. Roberts

Tionna Mitchell,

      Defendant.

_____/

**Response in Opposition to Emergency Motion
for Compassionate Release [R. 87]**

Respectfully submitted,

Matthew Schneider
United States Attorney

TERRENCE R. HAUGABOOK
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9157
Terrence.Haugabook@usdoj.gov

Dated: August 4, 2020

# Table of Contents

Table of Authorities.................................................................ii

Question Presented ................................................................ v

Statement of Facts................................................................. 1

Argument ............................................................................. 10

I.  The Bureau of Prisons has responded to Covid-19 by
    protecting inmates and increasing home confinement................. 10

II. The Court should deny Mitchell's motion for compassionate
    release. ...................................... 1**Error! Bookmark not defined.**

III. If the Court were to grant Mitchell's motion, it should order
     a 14-day quarantine before release. ................................ 30

Conclusion............................................................................ 31

Certificate of Service ........................................................... 32

i

# Table of Authorities

<u>Cases</u>

*Dillon v. United States*, 560 U.S. 817, 830 (2010)………… …………19, 21

*United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *1, *5 (6th Cir. June 2, 2020)…………………………… ..............14, 18, 19

*United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020)…………………………………………………....24, 27

*United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam)……………………………………………………….…..26

*United States v. Gray*, 2019 WL 4564735, at *3 (N.D. Ohio Sept. 20, 2019)…………………………………………………………..30

*United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008)……….18

*United States v. Israel*, No. 17-20366, 2017 WL 3084374, at *5 (E.D. Mich. July 20, 2017)……………………………………………………..26

*United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014)……….19, 21

*United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020)…..28

*United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020)………………………………………………….25-27

*United States* v. *Marshall*, 954 F.3d 823, 830 (6th Cir. 2020)………….21

*United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020)...........................................................22

*United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020).........................................................28

*United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020).........................................................17

*United States v. Peak*, No, 16-20460, 2020 WL 2214231(E.D. Mich. May 7, 2020) (Goldsmith, J.)..................................................23

United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020)......................2

*United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992)..............26

*United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001)...................18

*United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020)...........................................................21

*United States v. Sapp*, Case No. 14-20520, 2020 WL 515935, at *2 (E.D. Mich. Jan. 31, 2020) (Leitman, J.)................................................23

*United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010)......25

*United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009)..........18

*United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov. 21, 2019)...........................................................................30

*United States v. Zullo*, 2019 WL 7562406, at *3 (D. Vt. Sept. 23, 2019)…………………………………………………………………………..29

Statutes

18 U.S.C. § 3142(g) ................................................................22, 25

18 U.S.C. § 3553(a) .......................................................3, 20, 27, 28

18 U.S.C. § 3553(a)(5).................................................................29

18 U.S.C. § 3582(c)................................................................19, 21

18 U.S.C. § 3582(c)(1)(A) ............................. 1, 3, 18, 19, 20, 21, 22, 26, 27

18 U.S.C. § 3621(b) .....................................................................17

18 U.S.C. § 3624(g)(5)...............................................................15

28 U.S.C. §§ 994(t) ...........................................................20, 29, 30

34 U.S.C.§60541(g)(2).............................................................15

## Question Presented

Whether the defendant should be denied compassionate release.

# Statement of Facts

Tionna Mitchell is a twice- convicted identity thief and credit card fraudster, and a two-time absconder from two courts that both issued arrest warrants for her failure to appear. Less than one year ago, she was sentenced by this Court to 32 months' imprisonment for illegal credit card possession and usage, and identity theft. Prior to this court's sentence, Chief Judge Hood sentenced Mitchell to 34 months' imprisonment for the same offenses. The sentences are concurrent to one another.

Mitchell began serving her first sentence on April 12, 2018, and her concurrent sentence from this court was imposed on November 12, 2019. Mitchell now moves this Court for compassionate release, under 18 U.S.C. § 3582(c)(1)(A). Mitchell's motion should be denied.

Mitchell does not qualify for compassionate release. For starters, Mitchell does not satisfy the substantive requirements for compassionate release. Mitchell's health has been and continues to be proactively monitored by BOP staff at the FSL FCI Danbury. Except for a tooth and root extraction, and recent obesity diagnosis on March 4, 2020, Mitchell is in good health, has never been febrile, and therefore

1

has not exhibited any positive results for COVID-19. (Ex. A, Updated 2020 Medical Records, at p. 28). Indeed, on May 4, 2020, Mitchell tested negative for COVID-19. (Ex. B, Covid Test Results, at p. 1).

Mitchell fails to take into account that for five months since her obesity diagnosis, and three months since her negative Covid test, the BOP's safe practices and protocols are working and have in fact protected her from contracting COVID-19. Thus, Mitchell's motion amounts to an extremely speculative argument of the mere possibility that it "may spread" to her. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although Mitchell's heightened risk from Covid-19[1] based on her obesity qualifies as an "extraordinary and compelling reason[]" for release under USSG § 1B1.13(1)(A) & cmt. n.1(A), Mitchell is not otherwise eligible for release. Mitchell's offense and criminal history make her a danger to the community, which

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#diabetes (last visited August 3, 2020).

precludes release under USSG § 1B1.13(2), because Mitchell previously violated a lenient state probation by committing new criminal conduct on multiple occasions—involving credit card fraud and identity theft—which resulted in two separate federal convictions. Mitchell hid from police, and the court supervising her probation, for several months under another new fake identity. Mitchell has previously shown no hesitation on being dishonest with the Court in order to obtain release.

And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because the court should specifically consider the need for Mitchell's sentence to reflect the seriousness of her offense, provide punishment, promote general and specific deterrence, and to protect the public from further crimes committed by Mitchell. *See* 18 U.S.C. § 3553(a). The need to promote specific deference and protect the public is particularly relevant in this case. Mitchell is a serial identity thief and credit card fraudster as well as a probation violator. Mitchell committed the instant offenses before this Court, eluded apprehension for them by running from the scene, and went underground for six months under yet another new identity. Then, Mitchell came out of hiding to commit the offenses charged before

3

Chief Judge Hood. All of this illegal conduct took place while Mitchell was on probation for a lenient state HYTA sentence. *See* (Case No. 17-20652; R. 1: Indictment, PgID 1) (The Chief Judge Hood case); (Case No. 17-20263; PSR at ¶¶44–45; 47).

The Bureau of Prisons has also taken significant steps to protect all inmates, including Mitchell, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of August 3, 2020, this process has already resulted in at least 7,276 inmates being placed on home confinement. *See* BOP Covid-19 Website. At least over 100 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their

4

criminal activities," *Wilson*, 2020 WL 3056217, at *11—the Court

should deny Mitchell's motion for compassionate release.

## Background

In January of 2016, Mitchell was sentenced to a term of probation

under the Holmes Youthful Trainee Act ("HYTA") after a conviction for

Larceny. (Docket No. 17-20652, PSR at ¶ 28). While on probation,

Mitchell violated the court's order four times. Mitchell violated twice for

not complying with the drug screen requirement. First, she refused to

test, then she tested positive for Marijuana. (*Id*.). The other two times,

Mitchell violated by committing several federal criminal offenses

involving identity theft and illegal credit card usage and possession.

This led to two separate federal indictments of her along with a

different codefendant on each respective case. (*Id*. at ¶¶7–8, 35).

In the matter before this Court, Mitchell, in February and March

of 2017, possessed the in-store credit information pertaining to

customers of various retail stores. Mitchell possessed fake credit cards

and drivers licenses, bearing Mitchell's image, matching the name of

the retail store's customer. At the stores, Mitchell pretended to be the

customer who wanted to shop but had purportedly left their physical

credit card at home. Once the store employee relied on the fake identification items Mitchell presented, and allowed Mitchell to shop under the name of the victim customer, Mitchell spent thousands of dollars on items for herself and her female codefendant. During the March 2017 spending spree at Somerset Mall, Mitchell and her female codefendant's fraud scheme was detected. While they were being escorted by a loss prevention officer, Mitchell ran away and escaped. Mitchell jettisoned her fake identification in a stairwell of the parking structure. (Docket No. 17-20263, PSR at ¶¶13–19).

After the March 2017 incident, Mitchell evaded police and the court supervising her probation for six months until her apprehension on September 20, 2017, while committing the identity theft criminal conduct for which she was sentenced by Chief Judge Hood.

In the matter before Chief Judge Hood, on September 20, 2017, Mitchell obtained and assumed the identification of yet another person and tried to cosign on documents for a male codefendant to lease an expensive vehicle. A dealership employee performed a credit check against the photo and credit card identification documents Mitchell portrayed as her own. The employee became aware of Mitchell's

6

fraudulent portrayal and called police. Mitchell was arrested at the dealership. (Docket No. 17-20652, PSR at ¶¶7–9).

On the same day as her arrest, FBI executed a search warrant at Mitchell's Macomb County home. FBI found a cache of fraudulent photo identifications bearing Mitchell's image but other names, fraudulent credit cards, and 80 or more credit report documents pertaining to many of the names on those photo identifications—including for the name Mitchell used at the dealership. (*Id.*at ¶9; Docket No. 17-20623, PSR at ¶¶20–21). From the search, FBI discovered that after Mitchell committed the offense at Somerset Mall, she portrayed herself as newly relocated Pennsylvania native Ashley Marsh—complete with a fake pay stub from a fraudulent business operated by her codefendant McKinney's mother—and rented a condo in Macomb County with that identity. (Ex. C, KNC Management Leasing File Documents; Docket No. 17-20623, PSR at ¶24).

At her subsequent detention hearing, Mitchell tried to present her mother as a suitable living arrangement and third-party custodian. The detention hearing revealed that Mitchell's mother—the same person Mitchell intends to live with if released by this Court—previously

7

evicted Mitchell from her home. After both Mitchell <u>and</u> her mother

falsely told the Magistrate Judge her mother had never evicted her,

Mitchell's post-Miranda video interview, wherein Mitchell specifically

told FBI agents her mother had indeed evicted her before, was played

for the court. Ultimately, due to all of the evidence presented at the

hearing, Mitchell's mother (and home) was determined unsuitable for

third-party custodial placement. (ECF Nos. 36 and 37: Public Audio of

September 25, 2017 Detention Hearing). At the conclusion of the

detention hearing, Mitchell was detained because her history revealed:

she committed the federal identity theft and credit card offenses while

on a lenient state probation, previously evaded police and the probation

supervising court for a lengthy period under a new assumed identity,

possessed false identification and aliases, previously failed to appear for

court, and lacked stable employment. (Docket No. 17-20263, ECF No.

40: Order of Detention, PgID 173, 175).

Ultimately, Mitchell pleaded guilty before this Court. On

November 21, 2019, this Court sentenced Mitchell to a concurrent 20

months' imprisonment on the illegal credit card usage and possession

charges, and a consecutive 12 months for the aggravated identity theft

8

charge, for a total sentence of 32 months concurrent to the previous
sentence from Chief Judge Hood. (Docket No. 17-20263, ECF No. 84,
Judgment, PgID 749). Notably, however, <u>the equipment used to produce
all of the false identifications</u> possessed and used by Mitchell and her
codefendant <u>was never found</u>.[2] If released by this court, the
overburdened Probation Department does not have the ability to tether
everyone, including Mitchell. Mitchell, who has previously
misrepresented her living arrangements to a Magistrate Judge of this
court, could potentially do so again, readily obtain and assume another
identity, and go underground again if released. Not only did Mitchell
use a new fake identity to hide from law enforcement for the conduct
charged before this court, but she also simultaneously hid from the
court that was supervising her probation. There's also the fact that

---

[2] During the search of Mitchell's female codefendant's home on the case before this
Court, law enforcement found over 60 fraudulent out of state driver's licenses
respectively bearing the images of Mitchell or her codefendant McKinney.
Combined with the matters found during the search of Mitchell's Condo, in total,
agents located: 908 Sprint logins/passwords; seven miscellaneous accounts; two loan
accounts; 44 Sprint customer profiles; five Uber logins/passwords; 80 FICO credit
reports and 60 counterfeit credit cards; or 1,106 accounts total in Mitchell and her
codefendant's joint possession.

Mitchell's intended live-in host, her mother, readily made false statements to a Magistrate Judge of this court too.

Mitchell is 24 years old, and her projected release date is May 12, 2021. (Ex. D, Public Information Inmate Data). With her release being approximately 9 months away, Mitchell is eligible for placement in a residential reentry facility in about four months. According to her statements in the PSR at the time of sentencing, Mitchell abused Marijuana, the hallucinogen PCP, and alcohol. Otherwise, her health was good. (Docket No. 17-20652, PSR at ¶¶ 43, 45).

Despite the BOP's implementation of its protective safeguards, and her resultant Covid-free health for the past five months since her obesity diagnosis, Mitchell has moved for compassionate release based on generalized and speculative concerns about the COVID-19 pandemic.

## Argument

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-

3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal

11

and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, for free. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19. Indeed, for five months since her obesity diagnosis, and three months since her negative Covid test, these measures have helped Mitchell remain

12

protected from Covid-19. The BOP's measures will also ensure inmates receive any required medical care during these difficult times.

## B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in

13

deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not perfunctory. Over 7,276 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might

14

have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11. That is especially true with Mitchell who previously made false declarations to this court in order to obtain release, readily obtained and used more fake identification to hide from the court supervising her, and violated her prior probationary sentence with new criminal activity.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if she violates her terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release?

15

Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—have already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, she would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that her proposed home-confinement location is suitable for release, does not place her at an even greater risk of contracting Covid-19, and does not place members of the public at risk from her. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors,

16

including the limited availability of transportation right now and the
probation department's reduced ability to supervise inmates who have
been released. All of those decisions require channeling resources to the
inmates who are the best candidates for release. Because of her
continual ready access to false identification documents, and violation of
court supervision by absconding on probation, Mitchell fails to qualify
under the BOP's directive plan for release. She represents a serious
threat to recidivate.

Those types of system-wide resource-allocation decisions are
difficult even in normal circumstances. That is why Congress tasked the
Bureau of Prisons to make them and has not subjected the decisions to
judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other
provision of law, a designation of a place of imprisonment under this
subsection is not reviewable by any court."); *United States v. Patino*, No.
18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a
general rule, the Court lacks authority to direct the operations of the
Bureau of Prisons."). It is especially true now, given the Bureau of
Prisons' substantial and ongoing efforts to address the Covid-19
pandemic.

II.    **The Court should deny Mitchell's motion for compassionate release.**

Mitchell's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). And as the Sixth Circuit

18

recently held, this statutory exhaustion requirement is mandatory. *Alam*, 2020 WL 2845694, at \*1–\*4. Mitchell has exhausted on her obesity claim.

*Second*, even if a defendant exhausts, she must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and she must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2). Per the CDC's guidance, Mitchell's heightened risk from Covid-19 based on her obesity qualifies as an "extraordinary and compelling reason[]"under § 1B1.13(1)(A) & cmt. n.1(A).

*Third*, and this is where Mitchell falls woefully short, even if a defendant is eligible for compassionate release, a district court may not

19

grant the motion unless the factors in 18 U.S.C. § 3553(a) support

release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing,

those factors require the district court to consider the defendant's

history and characteristics, the seriousness of the offense, the need to

promote respect for the law and provide just punishment for the offense,

general and specific deterrence, and the protection of the public. 18

U.S.C. § 3553(a).

### A.   Mitchell is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13(2).

Even though Mitchell has exhausted her administrative remedies

on her obesity claim, compassionate release would be improper.

Compassionate release must be "consistent with applicable policy

statements issued by the Sentencing Commission." 18 U.S.C.

§ 3582(c)(1)(A). Congress tasked the Sentencing Commission with

"describ[ing] what should be considered extraordinary and compelling

reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as

developing "the criteria to be applied and a list of specific examples" for

when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States* v. *Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

21

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Mitchell and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

In all, a defendant seeking compassionate release must present extraordinary and compelling circumstances and the court must determine both that the sentencing factors outlined in §3553(a) weigh in favor of release and that the defendant does not pose a threat to others as determined by §3142(g). *See* 18 U.S.C. §3582(c)(1)(A); U.S. Sentencing Guidelines Manual § 1B.13; *United States v. Sapp*, Case No. 14-20520, 2020 WL 515935, at *2 (E.D. Mich. Jan. 31, 2020) (Leitman, J.) (summarizing compassionate release requirements). Here, Mitchell

22

argues her BMI of 31 and obesity diagnosis and absolutely no other accompanying illness such as diabetes, hypertension or the like.[3]

Mitchell cannot refute the fact that although she has had that diagnosis for five months, the BOP's safeguards and protocols have in fact kept her Covid free. So, the BOP's protective measures, as to her, are working and Mitchell is merely speculating about becoming ill with Covid. So when considered in combination with the BOP's successful Covid-19 pandemic response plan as to her, Mitchell's sole medical condition of obesity and BMI of 31, without more, does not warrant compassionate release. *See United States v. Peak*, No, 16-20460, 2020 WL 2214231(E.D. Mich. May 7, 2020) (Goldsmith, J.) (finding sole condition of obesity with BMI of 40 and young age did not warrant compassionate release).

Further, although a defendant's heightened risk from Covid-19 in prison might, in some circumstances, satisfy the medical or age criteria in USSG § 1B1.13 cmt. n.1, even considering her BMI and obesity diagnosis, Mitchell's circumstances cast doubt on whether that is true

---

[3] Although Mitchell tries to argue a disparate treatment from other cases such as *Ireland* and *Pacely*, those defendants, unlike Mitchell, had other underlying complications besides mere obesity.

here because she has no other accompanying malady. Section 1B1.13

requires an *individualized* assessment, and an individual defendant's

relative risk varies widely. *See United States v. Austin*, No. 15-20609,

2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on

the precautions at her prison, the number of Covid-19 cases there,

whether and how much that number might increase or decrease, the

prison's medical facilities, the defendant's release plan, the threat from

Covid-19 in her release location, her access to medical care if released,

and her willingness to abide by release restrictions and social-

distancing protocols. *See id.*

Mitchell quickly glosses over the fact that the BOP's pandemic

response plan is working because the Covid situation has abated at her

institution. (ECF 87: Def. Motion at 776). Further proof of abatement is

the fact Mitchell was diagnosed with obesity five months ago, tested

negative for Covid-19 three months ago, and has never contracted Covid

or been febrile. The abatement, or downward trend, also negates all of

the extraneous references counsel cites pertaining to the statements of

various litigants in civil suits against the BOP. Despite this abatement,

24

and with no proof whatsoever, Mitchell speculatively argues the Covid situation will ramp up again.

The government concedes Mitchell has not incurred disciplinary infractions in prison. (Ex. E., Discipline Records). Nevertheless, as discussed before, Mitchell readily obtains and uses personal identifying information, as well as violates and absconds from court probationary supervision by committing new criminal conduct. Thus, Mitchell is unlikely to abide by release restrictions and is more likely than most people to reoffend as well as expose herself and innocent people to Covid-19.

Mitchell is ineligible for compassionate release because she is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive

25

view of community safety—"a broader construction than the mere

danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161

(10th Cir. 1989) (per curiam). So even many "non-violent" offenders—

such as those who have been involved in serial or significant fraud

schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2);

*see Stone*, 608 F.3d at 948 n.7; *United States v. Reynolds*, 956 F.2d 192,

192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass

pecuniary or economic harm."); *United States v. Israel*, No. 17-20366,

2017 WL 3084374, at \*5 (E.D. Mich. July 20, 2017) (recognizing that

"economic harm may qualify as a danger" foreclosing release). Here,

Mitchell has engaged in economic harm and possessed stolen

identification documents on numerous occasions.

Adhering to § 1B1.13(2) is especially important given the current

strain on society's first responders and the rise in certain types of crime

during the Covid-19 pandemic. Police departments in many cities have

been stretched to their limits as officers have either contracted Covid-19

or been placed in quarantine. Some cities, including Detroit, have seen

spikes in shootings and murders. Child sex predators have taken

advantage of bored school-aged kids spending more time online. Covid-

19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Mitchell's release would endanger the community, § 1B1.13(2) prohibits reducing her sentence under § 3582(c)(1)(A). She has violated court probation orders with new criminal conduct.

Mitchell is still a danger to the community and is not eligible for compassionate release.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that she is not dangerous, she is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant

27

compassionate release . . . under 18 U.S.C. § 3553(a)")"; *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Mitchell eligible for compassionate release, the § 3553(a) factors should still disqualify her.

As it did when it imposed sentence, the Court must specifically consider the need for Mitchell's sentence to reflect the seriousness of her offense, provide punishment, protect the public from further crimes by Mitchell, and promote general and specific deterrence. *See* 18 U.S.C. § 3553(a). The need to promote specific deterrence is particularly relevant in this case given the Chief Judge Hood offense and the instant offenses of conviction were committed within 7 months of one another while Mitchell was a probation absconder and hiding under a new identity. Until her apprehension and sentencing by Chief Judge and this Court, Mitchell showed absolutely no sign of stopping her fraudulent criminal behavior. She would have continued living in Macomb County under

28

that newest fake identity. This court's sentence was imposed to also reflect the seriousness of the offense—a second conviction for fraud and identity theft after a lenient sentence of probation. Given the commission of her second such offense while on probation, this court's sentence was also imposed to protect the public from any further crimes by Mitchell.

Even if Mitchell could show rehabilitation, Congress explicitly prohibited this as a basis for a reduction in sentence: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 18 U.S.C. § 994(t); *see also* 18 U.S.C. § 3553(a)(5) (requiring sentencing courts to consider any pertinent policy statements). Unsurprisingly, then, the vast majority of courts to have addressed the issue have denied compassionate release based on rehabilitation, even for defendants whose rehabilitation appeared far more successful than Mitchell's. *See, e.g.*, *United States v. Zullo*, 2019 WL 7562406, at *3 (D. Vt. Sept. 23, 2019) ("His strongest argument concerns rehabilitation which in his case has been very successful—at least so far as one can tell on a paper record. But rehabilitation is specifically excluded as an independent basis for compassionate

release."); *United States v. Washington*, 2019 WL 6220984, at \*2 (E.D. Ky. Nov. 21, 2019) ("The language of § 994(t) evidences clear congressional intent to bar relief based on rehabilitation alone[.]"); *United States v. Gray*, 2019 WL 4564735, at \*3 (N.D. Ohio Sept. 20, 2019) (rejecting the defendant's argument "that his 'exemplary record' in prison provides an extraordinary and compelling reason").

Mitchell's motion must be denied because she is a danger to the community.

### III. If the Court were to grant Mitchell's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Mitchell's motion despite the government's arguments above, the Court should order that she be subjected to a 14-day quarantine before release.

## Conclusion

For these reasons, the Court should deny Mitchell's motion for a reduced sentence or recommendation of home confinement.

Respectfully submitted,
MATTHEW SCHNEIDER
United States Attorney

<u>s/ *Terrence R. Haugabook*</u>
Terrence R. Haugabook
(P44554)
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9157
Terrence.haugabook@usdoj.gov

Dated: August 4, 2020

31

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2020, I filed the foregoing with

the court via ECF which will send notice and a copy to the following:

Fabián Rentería Franco and Benton C. Martin
Email: Fabian_Renteria_Franco@fd.org


                                        s/Terrence R. Haugabook
August 4, 2020                          Terrence R. Haugabook
                                        Assistant U.S. Attorney